FILED
2011 Apr-21  PM 01:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **AAFCOR, LLC,** ] | |
| ] | |
| **Plaintiff/Appellant,** ] | |
| ] | |
| **v.** ] | **CV-09-BE-2575-NE** |
| ] | |
| **FRANK SPIRES, et. al.,** ] | |
| ] | |
| **Defendants/Appellees.** ] | |
| ] | |

**MEMORANDUM OPINION**

This case is before the court on appeal from the United States Bankruptcy Court for the

Northern District of Alabama.  The claims on appeal stem from Debtor Timothy D. Shelton's

bankruptcy proceedings.  *See In re Shelton*, Case No. 07-81534-JAC-7 (Bankr. N.D. Ala.).

Plaintiff/Appellant AAFCOR, Inc., a high-risk investment entity, claimed that Timothy Shelton

and the other Defendants—including his brother, Kenneth Shelton; his long-time accountant,

Frank Spires; and Jim Pope, a loan broker and friend—fraudulently induced AAFCOR into

lending upward of $1.5 million for Timothy Shelton's water businesses.  The claims center on

misrepresentations allegedly made by all Defendants/Appellees that Timothy Shelton owned

certain property that AAFCOR believed served as collateral for its loans, which it began making

in May 2006.  In reality, Timothy's brother Kenneth has owned the land since August 2000, as

AAFCOR unhappily discovered when Timothy Shelton filed for bankruptcy.

The bankruptcy court entertained cross-motions for summary judgment on AAFCOR's

claims alleging fraud and conspiracy against Timothy and Kenneth Shelton, Jim Pope, and Frank

Spires/Spires & Associates, P.C.  The bankruptcy court granted summary judgment in favor of the Defendants in two opinions and corresponding judgments.  AAFCOR appeals the bankruptcy court's decisions to this court under 28 U.S.C. § 158(a) as to the "core" claims against the Debtor, Timothy Shelton, and under 28 U.S.C. § 157(c)(2) as to the "non-core" claims against the other Defendants.  The court has reviewed *de novo* the record on appeal from the bankruptcy court's decisions granting summary judgment.  For the reasons discussed below, the court finds that summary judgment is merited in favor of the Defendants/Appellees.  Therefore, the bankruptcy court's orders are due to be AFFIRMED.

## I.  Procedural History

As part of Debtor Timothy Shelton's bankruptcy proceedings, Plaintiff AAFCOR filed claims against Timothy and Kenneth Shelton, Jim Pope, and Frank Spires/Spires & Associates, P.C. (collectively referred to as "Spires") alleging fraud, fraudulent suppression, and conspiracy. The parties filed cross-motions for summary judgment.  The bankruptcy court, after several hearings and full briefing by the parties, granted summary judgment in favor of the Defendants in two opinions and corresponding judgments.  On November 4, 2009, the bankruptcy court issued a memorandum opinion (the "Shelton Memorandum Opinion") and judgment granting summary judgment in favor of the Timothy Shelton on all of AAFCOR's claims against him, and partial summary judgment on AAFCOR's claims against Kenneth Shelton for fraud and conspiracy.[1]  In a second memorandum opinion and judgment on the same day, the bankruptcy court granted

---

[1]  The bankruptcy court only reserved ruling on one issue of Plaintiff's claims against Kenneth Shelton, involving allegations of partnership.  Because the bankruptcy court resolved that issue separately, the only issues finally resolved and certified for appeal before *this* court are those involving AAFCOR's conspiracy and fraud-related claims.

summary judgment in favor of Spires and Pope (the "Spires Memorandum Opinion") on all of AAFCOR's claims against them.

In each opinion, the bankruptcy court held, *inter alia*, that AAFCOR's knowledge that Kenneth Shelton owned the well that supplied water to Timothy Shelton's water business, the subject of AAFCOR's investment, as a matter of law negated any reasonable or justifiable reliance upon various misrepresentations that Timothy Shelton owned the rest of the land upon which the business operated.  The bankruptcy court thereby dismissed all of Plaintiff's conspiracy and fraud-related claims against the Defendants and certified each judgment as final, pursuant to Fed. R. Civ. P. 54 and Fed. R. Bankr. P. 7054.  AAFCOR appeals both opinions and judgments.

## II.  Background

This case presents a tale of risky business and reckless investment.  The story starts with a tax lawyer and a rocket scientist interested in investing in a water bottling business struggling to stay afloat.  Like any good story, the plot escalates, here with a deceitful debtor and the brother who bought his land to bail him out.  As the German philosopher Friedrich Nietzsche reportedly said, "Deep is the well of truth and long does it take to know what has fallen into its depths." The ownership of the water at the bottom of the well, in this case, reflects the whole truth of the matter—a costly truth, indeed, for the investors who bet their collateral on the wrong owner.

### A.    Facts

In accordance with the summary judgment standard set forth below, the following facts are presented in the light most favorable to AAFCOR as the non-moving party to the Defendants' motions for summary judgment.

3

*The Parties*

Timothy Sheldon, the bankruptcy Debtor, operated a water bottling and distribution venture in northwest Alabama.  His water business involved two operational entities: Springfield Premium Natural Water, Inc. ("SPNW") and Tennessee Valley Bottling Company, LLC ("TVBC").  To keep the working capital flowing, Shelton had borrowed money from numerous banks and credit unions long before AAFCOR entered the picture.  No stranger to troubled times, Sheldon's businesses steadily sank into debt as they struggled to obtain loan approval.  Seeking investors to keep afloat, Shelton turned for help to Jim Pope, a loan broker for the Federal Rural Development loan program.  Shelton solicited Pope's assistance to obtain rural development loans and to refinance his business assets.  Pope threw Shelton a life line by referring him to AAFCOR, LLC, which would ultimately invest over $1.5 million in loans to Shelton and his businesses.  Pope introduced AAFCOR to Timothy Shelton in early 2006.

AAFCOR is a sophisticated hedge-fund investment entity, not in the business of making "traditional loans."  (AAFCOR's Objs. to Prop. Findings of Fact & Conc. of Law, Doc. 2, at 12).  AAFCOR specializes instead in high-risk investment opportunities.  It decided to take such a risk by investing in Timothy Shelton's water business ventures, which were drowning in debt.  AAFCOR set out to bridge loans for working capital, provide business advice, increase the profitability of SPNW, and make TVBC operational.  AAFCOR solicited financing and began distributing loans to Timothy Shelton and SPNW in May 2006.  By April 2007, AAFCOR had expended more than $1.5 million in loans and other funds to further Timothy Shelton's water businesses; as a result, sales and business "improved dramatically."  (*Id.* at 13).

AAFCOR is comprised of two principals, Donna Zerbo and David Hirsch.  Though its

methods are complex, its concept is simple: the high-risk investment duo uses its experience and expertise to re-structure the finances of struggling companies with turn-around potential.  (Zerbo Depo., pp. 26, 30-32, 37, 45, 109-10).[2]

Zerbo is a practicing lawyer who specializes in tax and securities law.  In addition to holding a J.D. and a LLM degree in tax law,  Zerbo is also a certified public accountant.  She is experienced in handling real estate investments on behalf of clients, structuring loans secured by real property, and auditing business financials.  She is also experienced in securing private investors to fund business opportunities, and in drafting and reviewing contracts.  (Zerbo Depo., pp. 15-21, 56, 82-83, 258, 265-67).

Hirsch is an engineer who once worked for Boeing and NASA, a true "rocket scientist" by his own admission.  For more than 30 years, Hirsch has worked as a consultant, traveling to various struggling businesses and aiding in the restructuring of debt and operations to turn them around.  In that capacity, he has worked on behalf of banks as the intermediary for defaulting companies.  He also boasts experience buying businesses as investment opportunities, turning them around, and selling them for profit.  Pursuant to these activities, Hirsch is experienced in performing due diligence on the operations and finances of businesses.  Prior to investing in any business, he would fully investigate the operations of the business, and has worked with at least a

---

[2]  The court notes that the parties designated for appeal only certain documents from the record below, which the bankruptcy court provided to this court in electronic format.  Because the documents have not been filed into *this* court's Record, the court cannot cite thereto.  Instead, for ease of reference, the court will cite directly to the deposition transcript pages where the cited material appears. Additionally, the court notes that the evidentiary submissions certified for appeal include only selected pages of the deposition transcripts, preventing the court from a full review of *all* deposition testimony. Nevertheless, the court finds the portions of deposition testimony certified for appeal are adequate to glean the facts and admissions relevant to the court's resolution of the legal issues raised in this appeal.

dozen independent CPAs to determine the financial condition of the company beyond what was represented. (Hirsch Depo., pp. 11-21, 28-36.)

*The SPNW Property*

AAFCOR believed its investment loans qualified as a "first priority lien" against the land upon which SPNW operated. (Zerbo Depo., p. 49). Zerbo's basis for this belief was Timothy Shelton's representation that he owned the land. She also learned by talking with someone at the credit union that held SPNW's debt that it did not have a lien on the property. Zerbo admits that she did not conduct a title search or check to see if a mortgage was on the property before AAFCOR lent the initial $300,000 to Tim Shelton and his water businesses. (*Id.* at 51). Further, AAFCOR did not execute or record a mortgage or lien to secure its loans, despite Zerbo's knowledge of how to perfect a security interest in real property. (*Id.* at 61-62).

AAFCOR explains its understanding that SPNW operated "on a small parcel of property which contained the SPNW bottling plant and business property." (AAFCOR Br., Doc. 9, at 1). The Springfield well is located on "adjacent property" and supplies water for SPNW's bottling operations.[3] (*Id.*). At all times prior to Timothy Shelton's bankruptcy proceeding, AAFCOR

---

[3] In its brief AAFCOR attempts to differentiate the "Springfield Business Property" from the "Springfield Well Property," but the court cannot accept that distinction as a reasonable inference from the facts, even in the light most favorable to AAFCOR. None of the documents upon which AAFCOR purportedly relied separate the "business" part of the property from the "well" part of the property, which included several springs that supplied the well with its water. The main document AAFCOR relied upon, a March 31, 2006 financial statement signed by Timothy Shelton, references 65 acres of real estate labeled "Springfield Premium Natural Water, Inc." without distinction. The deposition testimony of Zerbo and Hirsch often refers to "the Springfield property" without further categorization. Further, AAFCOR does not dispute that the well was *adjacent* to the SPNW bottling plant and office buildings. The court, therefore, views the "Springfield property," as it is frequently referred to in Hirsch and Zerbo's deposition testimonies, as the land containing the bottling plant, the office buildings, *and* the springs/well.

believed that Timothy Shelton owned the portion of the SPNW property that contained the

bottling plant and office buildings.  AAFCOR also believed Timothy and Kenneth operated the

water business as partners, and that "[w]ith the water from the Springfield well, SPNW and/or

Timothy Shelton provided water to the Town of Lexington; operated its five gallon bottling line

from which bottles were sold to local customers; and sold water by the tanker load."  (*Id.* at 2).

TVBC, on the other hand, distributed water in plastic PET bottles sold in grocery stores,

drug stores, and the like.  While Timothy Shelton owned the TVBC plant, his brother, Kenneth,

owned the Carver Springs well, which they intended someday to jointly develop as the primary

water source for the TVBC plant.

Hirsch first met with Timothy Shelton in person on March 27, 2006 to discuss

AAFCOR's potential role in funding one of his business ventures.  Uncontroverted testimony

shows that Hirsch learned at this initial meeting that Kenneth Shelton, Timothy's brother, owned

the well and the surrounding property that served as the water source for SPNW.  Thus, Hirsch

testified that, while he knew from "early on" that Kenneth Shelton owned the Springfield well

and surrounding property, he did not find out until much later that Kenneth actually owned the

*entire* Springfield property, including the bottling plant and business offices.  (Hirsch Depo., pp.

154-55).  Though Timothy Shelton had owned the entire Springfield property in the late 1990s,

he transferred all of it to Kenneth in 2000 to avoid foreclosure by a local bank.  (AAFCOR Br.,

Doc. 9. at 3).  No one disputes that the deed evidencing this transfer was duly recorded in the

county records.

In his dealings with AAFCOR, Timothy Shelton repeatedly told Hirsch and Zerbo that

while Kenneth owned the well, he (Timothy) owned all the rest of the Springfield Property,

7

including the land where the SPNW bottling plant and other buildings sat.  Several times,

Timothy made this representation in Kenneth's presence.  In AAFCOR's various meetings and

conversations with Timothy, Kenneth, Jim Pope, and Frank Spires, no one represented that

Kenneth actually owned *all* of the Springfield Property (i.e., the land with the buildings and the

well), nor did they correct any misrepresentations to the contrary.  Zerbo testified that Kenneth

said to her: "So long as my brother owns the Springfield business property, I will provide water

to it."  (AAFCOR Br., Doc. 9, at 33 (citing Zerbo Aff. ¶ 19)).  However, no contract or written

agreement existed between the brothers concerning the water supply.

*The Business Plan*

At some point before AAFCOR advanced any money to Timothy, Jim Pope, the loan

broker who initially referred Timothy to AAFCOR, sent Hirsch a partial business plan for the

water businesses; the plan included some projections, some pictures of the SPNW buildings and

two or three springs, and part of a business plan summary.  At some later point, Hirsch obtained a

complete business plan from a Tennessee bank.  One or both of the plans indicated that Timothy

Shelton or his company owned the entire Springfield property.  (Hirsch Depo., pp. 72, 81, 253).[4]

---

[4] AAFCOR again attempts to draw an unreasonable distinction between the parcels of the Springfield property containing the buildings and the springs/well.  In its brief, AAFCOR argues as grounds for fraud that "Mr. Pope represented that the SPNW *bottling plant and surrounding acreage* was owned by Timothy Shelton."  (AAFCOR Br., Doc. 9, at 23) (emphasis added).  However, the actual business plan does not appear to limit its representation of ownership to the bottling plant.  To the contrary, Hirsch's deposition testimony confirms that the partial business plan he received from Pope contained pictures of the "SPNW assets," which included pictures of both the buildings *and the several springs* that supplied water to the well.  (Hirsch Depo., p. 72).  At the same time, the record does not reflect that the business plan indicated that Kenneth Shelton owned the springs and the well.  Presumably, therefore, the plan represented that Timothy Shelton owned *all* of the Springfield property—and Zerbo and Hirsch admit they knew Kenneth owned at least the springs/well and surrounding land on the Springfield property.

8

*The Financial Statement*

Early in his discussions with Jim Pope and Timothy Shelton about investing in SPNW, Hirsch also obtained a "Statement of Financial Condition," that had been signed by Timothy D. Shelton on April 5, 2006.  Attached to the financial statement is a two-page schedule of installment debts, contracts, notes, and mortgages payable.  The financial statement itemizes Timothy Shelton's assets, liabilities, and net worth as of March 31, 2006.  No disclosure appears on the document limiting its use.  Further, no accountant's name or signature, nor the name of any accounting firm, appears on the document.  The statement projects the value of  Timothy's total assets as $25,056,600.  This figure represents four categories: cash in bank ($150,000); Real Estate ($11,865,000); Business Investments ($10,200,000); and Other Assets, including equipment ($2,711,600).  The statement represents assets from a number of real estate properties, including "Springfield Premium Natural Water, Inc. (65 acres)," listed as a $5 million real estate asset.  AAFCOR relied on this representation as evidence that Timothy Shelton owned the Springfield bottling plant and office buildings.

AAFCOR states that a copy of the financial statement appeared in Jim Pope's partial business plan, and Timothy Shelton also later provided a copy of the statement.  Hirsch testified that while Timothy Shelton did not state in so many words that the figures in the financial statement were true and accurate, the document "spoke for itself."  (Hirsch Depo., p. 86).

Later, Hirsch learned that Shelton's long-time accountant, Frank Spires of Spires & Associates, P.C., had prepared the financial statement at Shelton's request.  AAFCOR knew the March 31, 2006 statement was neither certified nor audited, and that Spires's name does not appear on the face the document.  On at least one occasion, Hirsch met with Spires at his office

and discussed the financial statement.  At that meeting, Spires said that he "put together" the statement for Timothy Shelton at his request, "but he did not certify it."  (Hirsch Depo., p. 94).  Spires did not make any affirmative representations as to the accuracy of its contents, nor did he expressly deny its accuracy.  AAFCOR's expert accountant, Jesse Slaton, identifies many erroneous values contained in the financial statement relied upon by AAFCOR.    Hirsch and Zerbo testified they never had reason to question the information contained in the financial statement and in the business plan prepared by Pope until Timothy Shelton eventually filed for bankruptcy, a process that revealed the fact that Kenneth Shelton—not Timothy—owned not just the spring and the well, but *all* of the SPNW property since 2000, six years before AAFCOR began investing in the property.  (*See* Zerbo Depo., p. 130).

*AAFCOR's Due Diligence*

Hirsch traveled to Alabama to begin performing due diligence on the SPNW property sometime in May 2006.  Hirsch had his own key to the SPNW offices and full access to Timothy Shelton's files and records, including his personal and business tax records.  With help from the office manager, Sherry Baker, Hirsch verified the existence of all items and properties listed as assets on Timothy Shelton's financial statement.  Hirsch conducted a thorough audit of all equipment listed.  As for the real property, he found that some property interests were recorded, and some were not.  Hirsch testified that he confirmed the existence and ownership of all the real properties listed on the financial statement.  He verified some properties by matching sale prices in the file.  For the "Springfield Premium Natural Water" property, Hirsch said he reviewed the business's water supply and sales contracts.  (Hirsch Depo., pp. 99-101, 104).  In the course of his due diligence, Hirsch visited the SPNW property at least 120 times.  (AAFCOR Reply Br.,

10

Doc., 21, at 14).

Hirsch also went to the courthouse in Florence, Alabama, "looking for landownership and title information from the court." (*Id.* at 243). With the assistance of a clerk, Hirsch obtained title paperwork "showing the legal description of the land that was owned by Tim Shelton and the land owned by Kenneth Shelton." (*Id.* at 245). Hirsch's search produced the deed conveying the Springfield property from Timothy Shelton to Kenneth Shelton in 2000. (*Id.*; AAFCOR Reply Br., Doc. 21, at 6). However, the deed described the property conveyance in metes and bounds, which Hirsch could not understand. Hirsch met with Timothy Shelton, showed him the deed, and asked him to verify which property was reflected by the metes and bounds description. Timothy showed Hirsch the land and said that he owned the property on which the SPNW office and bottling plant were situated, and that his brother, Kenneth, owned the acreage beyond the fence that ran from the road to the SPNW buildings, which included the spring that supplied water to SPNW, the well house, the well, and the pump. (Hirsch Depo., p. 133-35). Hirsch relied on Timothy's representation and did not show the deed to Zerbo, or to any other lawyer, for further interpretation. (*Id*. at 138, 244-45). AAFCOR did not conduct a survey of the land to discern the actual property conveyed by that 2000 document.

Though Hirsch did not share the deed documents he discovered from his title search, Zerbo independently hired a law firm to perform title searches on the SPNW property. (Zerbo Depo., p. 157). While Zerbo testified that she relied on the law firm "to do whatever was necessary" to secure AAFCOR's loan on the property, and confirmed that she "saw title searches" on the Springfield property produced from the firm's investigation, but she did not

11

recall the particular contents or results.  (*Id.* at 498-99).[5]

**B.     Claims**

The claims on appeal involve affirmative fraud, fraudulent suppression, accounting malpractice, and conspiracy to defraud.

AAFCOR alleged affirmative fraud against Timothy Shelton, Kenneth Shelton, Jim Pope, and Frank Spires/Spires & Associates, P.C. based upon written and oral misrepresentations by all of the Defendants that Timothy Shelton owned the property on which he operated his SPNW water bottling business.  The written misrepresentations are based on the information presented in the partial business plan provided by Jim Pope and Timothy Shelton's March 31, 2006 Statement of Financial Condition that indicates that Timothy Shelton owned the SPNW property. AAFCOR's affirmative fraud claims against Spires and Timothy Shelton also involve erroneous values set forth in Timothy Shelton's financial statement that overinflated his net worth.

AAFCOR's fraudulent suppression claim targets Kenneth Shelton and Frank Spires. Kenneth's alleged liability is premised upon his failure to correct misstatements made in his presence about Timothy Shelton's ownership of the SPNW property, which Kenneth actually owned. AAFCOR alleges that Spires's fraudulent suppression is premised upon his failure to disclose the specific misrepresentations contained in Timothy Shelton's financial statement, which Spires prepared, during his discussions about the statement with Zerbo and Hirsch.

AAFCOR raised an accounting malpractice claim against Spires based upon the inaccuracies contained in the financial statement.  AAFCOR argues that Spires owed a duty to

---

[5] The court notes that these results were not included in the materials designated on appeal for this court's review.

disclose the inaccuracies to AAFCOR because AAFCOR was within a specifically foreseeable and limited group of third parties who would rely upon the statement.  *See Boykin v. Arthur Anderson & Co.*, 639 So. 2d 504, 510 (Ala. 1994).

Finally, AAFCOR charged all Defendants with conspiracy, based on their alleged intent and concerted effort to defraud AAFCOR.  As further discussed below, all AAFCOR's claims ultimately rise or fall upon the court's analysis of reasonable reliance, an essential element to the fraud-related claims.

### III.  Issues Presented

This court must consider whether the bankruptcy court erred in finding no genuine issues of material fact and in granting judgment as a matter of law to all Defendants.  To that end, the court agrees with AAFCOR that the determinative issue in this case is not whether AAFCOR reasonably *invested* $1.5 million into Timothy Shelton and his water bottling business; instead, the dispositive legal issue concerning AAFCOR's fraud-related claims is whether AAFCOR *reasonably relied* on the misrepresentations of all Defendants that Timothy Shelton owned the land that contained the SPNW bottling plant and business offices.  AAFCOR's claims also raise the question of whether it reasonably relied on the other erroneous figures contained in Timothy Shelton's March 31, 2006 financial statement.

### IV.  Standard of Review

#### A.    "Core" vs. "Non-core" Dispute

The parties raise an initial disputed matter concerning "core" versus "non-core" claims.  "Core proceedings" are those that "arise under" or "arise in" a Title 11 bankruptcy case, whereas

"non-core proceedings" include those that are "otherwise related" to a Title 11 bankruptcy case.

*See* 28 U.S.C. § 1334(b)(1) (defining core); (c)(1) (non-core).  While core proceedings include,

but are not limited to, sixteen categories of proceedings enumerated in 28 U.S.C. § 157(b)(2), the

Eleventh Circuit has adopted the following test for making the core/non-core determination:

> If the proceeding involves a right created by the federal bankruptcy law, it is a
> core proceeding; for example, an action by the trustee to avoid a preference. If the
> proceeding is one that would arise only in bankruptcy, it is also a core proceeding;
> for example, the filing of a proof of claim or an objection to the discharge of a
> particular debt. If the proceeding does not invoke a substantive right created by
> the federal bankruptcy law and is one that could exist outside of bankruptcy it is
> not a core proceeding; it may be related to the bankruptcy because of its potential
> effect, but under § 157(c)(1) it is an "otherwise related" or non-core proceeding.

*In re Toledo*, 170 F.3d 1340, at 1348 (11th Cir. 1990) (citation and quotation omitted).

In arguing that this court should apply a *de novo* standard of review to the bankruptcy

court's decision, AAFCOR develops a lengthy argument that because certain claims are "non-

core," 28 U.S.C. § 157(c)(1) demands that the bankruptcy court's findings and conclusions are

"proposed," and thus subject to the district court's *de novo* review of "those matters to which any

party has timely and specifically objected."  The provision AAFCOR relies on reads:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is
> otherwise related to a case under title 11. In such proceeding, the bankruptcy
> judge shall submit proposed findings of fact and conclusions of law to the district
> court, and any final order or judgment shall be entered by the district judge after
> considering the bankruptcy judge's proposed findings and conclusions and after
> reviewing de novo those matters to which any party has timely and specifically
> objected.

28 U.S.C.A. § 157(c)(1).

The Spires Defendants respond by arguing that AAFCOR never objected to the

bankruptcy court's entry of final orders or judgment, and in fact, *requested* that the bankruptcy

court "render a judgment" in its favor in its complaint, including its amended complaints, and
summary judgment motions.  Those Defendants point to Rule 7008 of the Federal Rules of
Bankruptcy Procedure, which reads:

> In an adversary proceeding before a bankruptcy judge, the complaint,
> counterclaim, cross-claim, or third-party complaint shall contain a statement that
> the proceeding is core or non-core and, if non-core, that the pleader does or does
> not consent to entry of final orders or judgment by the bankruptcy judge.

 Spires argues that because AAFCOR failed to state its lack of consent to final orders or
judgment in its original pleadings in violation of Rule 7008, it cannot now challenge the
bankruptcy court's jurisdiction to enter final orders and judgments on its non-core claims.  Spires
also argues that AAFCOR's request that the bankruptcy court "*render a judgment*" on its non-
core claims indicates its consent to that court's entry of final judgment on those claims.

     In context, the court interprets AAFCOR's argument as an attempt to apply the *de novo*
standard of review on appeal rather than a per se challenge to the bankruptcy court's jurisdiction
to enter final judgment on its non-core claims.  For instance, AAFCOR explains: "The
bankruptcy judge's determination as to whether a proceeding is a 'core proceeding' or 'non-core
proceeding' is important *given that it determines* the nature of the bankruptcy judge's findings
(final vs. proposed), and *the standard of appeal (sic) thereto utilized by the district courts*."
(AAFCOR's Objs. to Proposed Findings of Fact & Concs. of Law ¶ 6) (emphasis added).  As a
practical matter, the court agrees that the nature of AAFCOR's claims against all the Defendants
other than Timothy D. Shelton are "non-core" proceedings.  As to the remainder of AAFCOR's
argument, however, the court agrees in part and disagrees in part.

     On one hand, AAFCOR attempts to challenge the bankruptcy court's jurisdiction to enter

a final judgment on its non-core claims.  The court views this argument as without merit because AAFCOR asked the bankruptcy court to "render a judgment" on them, indicating its consent to that court's entry of final judgment.[6]  Moreover, AAFCOR did not timely indicate its lack of consent to the bankruptcy court's entry of final judgment on its non-core claims, as required by the Federal Rules of Bankruptcy Procedure.  On the other hand, AAFCOR argues for application of a *de novo* standard of review.  The court agrees with AAFCOR that *de novo* is the appropriate standard of review but for different reasons.

**B.      Standard on Appeal**

A district court reviews *de novo* a bankruptcy court's entry of summary judgment.  *In re Optical Technologies, Inc.*, 246 F.3d 1332, 1335 (11th Cir. 2001).  However, the district court may not make independent factual findings on appeal.  *In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996).  This court "must accept the bankruptcy court's factual findings unless they are clearly erroneous, and give due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses."  *Id.*  The Defendants, therefore, argue here that this court should apply the clearly erroneous standard to the bankruptcy court's "Findings of Fact."

However, the Eleventh Circuit has held that because summary judgment "by definition involves no findings of fact," the only applicable standard of review of a bankruptcy court's entry of summary judgment is *de novo*.  *In re Optical Technologies, Inc.*, 246 F.3d at 1335.  As the

---

[6] Ultimately, the court also finds AAFCOR's argument without consequence because under either approach, viewing the judgment on the non-core claims as final or non-final, the result is the same.  If the court viewed the bankruptcy court's final judgments below as "proposed findings of fact and conclusions of law" as described under 28 U.S.C.A. § 157(c)(1), it would merely adopt and incorporate them into a final judgment, which uses different semantics but reaches the same effect of affirming the bankruptcy court's final judgments.  Moreover, under either approach, the court would apply the *de novo* standard of review.

Court stated:

> To the extent, however, that the district court's opinion may be read to suggest
> that appellate review of a bankruptcy court's entry of summary judgment may be
> governed by a clearly erroneous standard, <u>we take this opportunity to make clear
> that both the district court and this Court review a bankruptcy court's entry of
> summary judgment *de novo*</u>. The district court relied on *In re Club Assocs*.,
> which explained that "factual findings by the bankruptcy court are reviewed
> under the limited and deferential clearly erroneous standard." 951 F.2d at 1228.
> While it is true that, in general, a district court reviews a bankruptcy court's
> factual findings for clear error, we do not read *In re Club Assocs*. to hold, nor
> could it be so read in light of our precedent, that the standard of review for
> summary judgment, <u>which by definition involves no findings of fact</u>, is anything
> other than *de novo*. *See also Rosen v. Bezner*, 996 F.2d 1527, 1530 n. 2 (3d
> Cir.1993) ("because summary judgment may only be granted where there is no
> genuine issue of material fact, any purported 'factual findings' of the bankruptcy
> court cannot be 'factual findings' as to disputed issues of fact, but rather are
> conclusions as a matter of law that no genuine issue of material fact exists.").
> Quite simply, our law is, and has been, that a summary judgment ruling is
> reviewed *de novo*.

*Id.* (emphasis added).

Therefore, although the bankruptcy judge in this case organized his opinions into

"Findings of Fact" and "Conclusions of Law," the court will review both the facts and law

presented in those opinions under a *de novo* standard.  Further, the court finds the information

presented in the bankruptcy court's "Findings of Fact" sections generally represents a recitation

of undisputed matter and facts in the light most favorable to the Plaintiff, a standard the

bankruptcy court expressly recognized in both its opinions.  In any event, the court does not find

that the facts recited by the bankruptcy court are entitled to deferential review under a clearly

erroneous standard, nor could they be.

Under the *de novo* review, this court applies the same standard to a motion for summary

judgment on appeal as required of the original court.  *See In re Kingsley,* 518 F.3d 874, 876 (11th

17

Cir. 2008); *see also* Fed. R. Bankr. P. 7056 (making Fed. R. Civ. P. 56's summary judgment standard applicable in bankruptcy adversary proceedings).

C.      **Summary Judgment Standard**

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: 1) whether any genuine issues of material fact exist; and if not, 2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact *or* by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.* Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

18

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.

After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. However, mere disagreement between the parties concerning the facts does not defeat summary judgment unless disagreement presents a genuine issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A dispute raises a genuine issue of fact "only if a reasonable jury considering the evidence presented could find for the nonmoving party." *Anderson*, 477 U.S. at 248. Substantive law determines which facts are material and which facts are irrelevant, and "only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment." 477 U.S. at 248; *see also Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Epolito v. Prudential Ins. Co. of Am.*, 737 F. Supp. 2d 1364, 1378 (M.D. Fla. 2010).

Additionally, the applicable Rule 56 standard is not affected by the filing of cross motions

for summary judgment.[7]  *See, e.g., United States v. Oakley*, 744 F.2d 1553, at 1555-56 (11th Cir.

1984).  When parties file cross motions for summary judgment, "each side must still establish the

lack of genuine issues of material fact and that it is entitled to judgment as a matter of law."

*Busby v. JRHBW Realty, Inc.*, 462 F. Supp. 2d 1283, 1288-89 (N.D. Ala. 2009).  "The fact that

both parties simultaneously are arguing that there is no genuine issue of fact . . . does not

establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."

*Id.* (internal quotation marks omitted).  The Eleventh Circuit has noted that "[c]ross motions for

summary judgment will not, in themselves, warrant the court in granting summary judgment

unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely

disputed."  *Oakley*, 744 F.2d at 1555.  Nevertheless, "cross-motions may be probative of the non-

existence of a factual dispute when . . . they demonstrate a basic agreement concerning what legal

theories and material facts are dispositive."  *Id.* at 1555-56.

## V.  Discussion

AAFCOR's various claims against the Defendants ultimately rise or fall upon analysis of

---

[7] The court notes that although cross-motions for summary judgment were apparently filed in the bankruptcy court, that court granted the Defendants' motions for summary judgment without expressly analyzing or resolving Plaintiff's motion.  On appeal, AAFCOR only devotes two sentences of its briefing towards a conclusory request that this court grant summary judgment in its favor.  (*See* AAFCOR Br., Doc. 9, at 57).  AAFCOR's failure to brief the merits of its summary judgment motion constitutes a waiver and abandonment of that issue on appeal. *See Access Now, Inc. v. S.W. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").  Thus, AAFCOR's motion for summary judgment is not properly before this court.  Additionally, because the court finds that the Defendants' motions for summary judgment are due to be granted, Plaintiff's motion necessarily fails.  Still, the court recites the standard for cross-motions on summary judgment to show that the mere filing of cross motions does not relieve the court from examining the record for itself to determine whether any genuine issues of material fact exist.

reasonable reliance, which is an essential element to its claims on appeal.[8]  The court recognizes that generally, the issue of reasonableness presents fact questions for a jury to weigh.  *See Shaffer v. Regions Financial Corp.,* 29 So. 3d 872 (Ala. 2009).  In *this* case, however, ample evidence from the testimony of AAFCOR's principals shows that its reliance was not reasonable as a matter of law.  Because the court finds as a matter of law that AAFCOR cannot establish its reasonable reliance, as set forth below, the Defendants are entitled to judgment as a matter of law.  The bankruptcy court, therefore, thus properly granted summary judgment.

A.    **Alabama Law**

Alabama law governs AAFCOR's claims against the Defendants for fraud, fraudulent suppression, accounting malpractice, and conspiracy, as set forth above, except that AAFCOR's affirmative fraud claim against Timothy Shelton also implicates certain bankruptcy laws.  Therefore, the bankruptcy court measured AAFCOR's fraud claims against Timothy Shelton under both Alabama law and the Bankruptcy Code.  On appeal, AAFCOR presents no arguments specific to its fraud claims under the Bankruptcy Code, and instead argues only under the fraud standard in Alabama case law.  Thus, the court considers AAFCOR's bankruptcy fraud claims abandoned and will only address its fraud claim against Timothy Shelton under Alabama law.  *See Access Now, Inc. v. S.W. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

1.    Fraud

---

[8] As explained below, AAFCOR's claims incorporating the lesser justifiable reliance standard have been abandoned on appeal.  Therefore, this court focuses its discussion and analysis on reasonable reliance.

AAFCOR claimed fraud against all Defendants under Alabama law. Fraud is actionable under Alabama Code § 6-5-101: "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." In Alabama, fraud requires proof of four elements: (1) a false representation, (2) of a material existing fact, (3) *reasonably relied upon* by the plaintiff, (4) who suffered damage as a proximate consequence of the misrepresentation. *See Exxon Mobil Corp. v. Alabama Dep't of Conserv. & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007); ALA. CODE § 6-5-101. Fraud is never presumed; it must be clearly and satisfactorily proven. *Lamb v. Opelika Prod. Credit Ass'n*, 367 So. 2d 957, 960 (Ala. 1979) (citation omitted). Actionable fraud under the Alabama Code requires an affirmative statement or representation. *Mann v. Adams Realty Co.*, 556 F.2d 288, 296-97 (11th Cir. 1977).

The Defendants essentially do not address or dispute elements two or four. Two of the Defendants, Kenneth Shelton and Jim Pope, deny in their briefs that they made any false representations. (*See generally* Docs. 12 & 13). However, the court is bound to view the facts in the light most favorable to AAFCOR under the summary judgment standard, and because AAFCOR asserts that these Defendants *did*, in fact, make false representations that would be actionable under Alabama fraud, the court assumes those assertions to be true for the purposes of summary judgment. Therefore, the only remaining element material to resolution of the Defendants' summary judgment motions is reasonable reliance. If the facts in the light most favorable to AAFCOR cannot demonstrate that it *reasonably relied* on the Defendants' alleged misrepresentations as a matter of law, it cannot survive summary judgment on its Alabama fraud claims against any of the Defendants.

22

The reasonable-reliance standard under Alabama law holds that where a party has "reason to doubt the truth of an oral representation or is informed of the truth before he acts, he may not reasonably act or rely on that representation." *Ramsay Health Care, Inc. v. Follmer,* 560 So. 2d 746, 748 (Ala. 1990) (citing *Bedwell Lumber Co. v. T & T Corp.,* 386 So. 2d 413 (Ala.1980)). Stated differently, Alabama law does not consider reliance to be reasonable "[w]here one has knowledge of the falsity of a representation or even reason to doubt the truth of a representation." *Patterson v. United Cos. Lending Corp.*, 4 F. Supp. 2d 1349, 1354 (M.D. Ala. 1998) (citing *Ramsay*, 560 So. 2d at 748; *Guillot v. Beltone Electronics Corp.,* 540 So. 2d 648, 649 (Ala. 1988)); *Taylor v. Moorman Manuf. Co.,* 475 So. 2d 1187, 1189 (Ala. 1985); *Bedwell Lumber Co.,* 386 So. 2d at 415).

These principles establishing reasonableness of reliance as a matter of law have long been recognized in Alabama courts.  In fact, an 1849 Alabama Supreme Court opinion formed the bedrock of the reasonable-reliance standard:

> . . . [G]enerally, such [mis]representation must not be mere matter of opinion, or in respect of facts equally open to the observation of both parties, and concerning which the purchaser, had he exercised ordinary prudence, could have attained correct knowledge. **If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "*volunti non fit injuria*."**

*Munroe v. Pritchett*, 16 Ala. 785, 1849 WL 538, *2 (Ala. 1849) (emphasis added) (cited in over 100 Alabama cases and quoted with approval in *Alfa Life Ins. Corp. v. Green*, 881 So. 2d 987, 992 (Ala. 2003)).  Although at least twenty-one Alabama cases have cited *"volunti non fit injuria"* in context of the reasonable-reliance standard (all quoting *Munroe v. Pritchett*), none of those courts paused to define the maxim.  Because the maxim is not specifically defined in

Alabama case law, this court looks to outside resources to expound upon its meaning.

*Volenti non fit injuria* is a Latin phrase meaning "[n]o injury is done to a willing person." Oxford English Online Dictionary (2011), *available at* www.oed.com:80/Entry/ 224442.  The maxim *volunti non fit injuria* in common law refers to the doctrine of voluntary exposure to risk, "which states that when an individual knows and comprehends the danger, but voluntarily exposes him- or herself to it, that person is deemed to have assumed the risk and is precluded from recovering for an injury resulting from same." C.J.S. *Negligence* § 387 (2011).  The maxim "is predicated on the theory of knowledge and appreciation of the danger" and "involves the taking of a calculated risk." *Id.* (citations omitted).  "The fulcrum of the *volenti non fit injuria* defense is knowledge of the circumstances that create the danger and knowledge and appreciation of the danger itself."  57B Am. Jur. 2d *Negligence* § 767 (2010).

The policy of the reasonable-reliance standard as expressed by the Alabama Supreme Court is "not only to discourage fraud *but also to discourage negligence and inattention to one's own interests*."  *Alfa Life Ins. Corp.*, 881 So. 2d at 992 (quotation marks and citation omitted) (emphasis added).  Therefore, "the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests," and "[i]n order to recover for misrepresentation, the plaintiffs' reliance must . . . have been reasonable under the circumstances."  *Id.* (quotation marks and citation omitted).

2.   Fraudulent Suppression

AAFCOR argues fraudulent suppression against only Kenneth Shelton and Frank Spires. (AAFCOR Br., Doc. 9, at 27-28).  The elements necessary to prove fraudulent suppression under Alabama law are: "(1) that the defendant had a duty to disclose an existing material fact; (2) that

24

the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge

of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain

from acting; and (5) that the plaintiff suffered actual damage as a proximate result of acting or of

not acting." *Ex parte Household Retail Servs., Inc.,* 744 So. 2d 871, 879 (Ala. 1999) (citing

*Booker v. United Am., Inc.,* 700 So. 2d 1333, 1339 (Ala. 1997)).

Under Alabama law, reasonable reliance is an element required in <u>both</u> misrepresentation

and suppression claims. *Hawk v. Roger Watts Ins. Agency*, 989 So. 2d 584, 589 (Ala. Civ. App.

2008); *see also Foremost Ins. Co. v. Parham,* 693 So. 2d 409, 421 (Ala. 1997) (reinstating the

"reasonable reliance" standard "in all fraud cases" filed after March 14, 1997).  The standard for

reasonable reliance for fraudulent suppression is the same standard previously set forth for

affirmative fraud.

      3.    <u>Accounting Malpractice</u>

AAFCOR claims that Frank Spires and his accounting firm are liable under Alabama law

for negligence/accounting malpractice.  The Alabama Supreme Court expressly adopted the

standard for an accountant's liability to third parties as set forth in the *Restatement (Second) of

Torts* § 552 (1977):

> (1)    One who, *in the course of his business,* profession or employment, or in
> any other transaction in which he has a pecuniary interest, *supplies false
> information* for the guidance of others in their business transactions, is
> subject to liability for pecuniary loss caused to them by their *justifiable
> reliance* upon the information, if he *fails to exercise reasonable care or
> competence in obtaining or communicating the information.*

> (2)    Except as stated in Subsection (3), the liability stated in Subsection (1) is
> limited to loss suffered: (a) by the person or one of limited group of
> persons for whose benefit and guidance *he intends to supply the
> information or knows that the recipient intends to supply it,* and (b)

through reliance upon *it in a transaction that he intends the information to influence or knows that the recipient so intends* or in a substantially similar transaction.

(3)     The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Boykin v. Arthur Anderson & Co.,* 639 So. 2d 504, 510 (Ala. 1994) (emphases added).  The Court summarized its approach as follows: "Basic principles of justice require that an accounting firm be held liable for its intentional or negligent dissemination of inaccurate financial reports to specifically foreseen and limited groups of third parties for whose benefit and guidance the accounting firm supplied the information."  *Id.*

In adopting the Restatement approach, the Court in *Boykin* thus held that two of the essential elements required to establish professional liability for accountants in fraud cases are 1) a duty owed to the plaintiff, and 2) the plaintiff's justifiable reliance on the accountant's work. *Id.* at 509-10.  Both the bankruptcy court and Spires cited *Boykin* to support application of a "reasonable reliance" standard to accounting malpractice, despite the Restatement's application of "justifiable reliance."[9]  (Spires Mem. Op., at 10 ¶ 6; Spires Br., Doc. 11, at 27-39).  AAFCOR, however, applies *neither* standard in its briefs on appeal; it solely argues the *duty* element for accounting malpractice and fails to address the reliance element altogether, whether it be reasonable or justifiable.  Regardless of which standard correctly applies, therefore, the court finds this claim abandoned because AAFCOR has presented *no* legal argument to support reasonable or justifiable reliance on the financial statement prepared by Spires, an essential

_____

[9] The court also notes that no Alabama case since *Boykin* has actually applied the Restatement's justifiable reliance standard to an accounting malpractice claim.

element of its malpractice claim.  *See Access Now, Inc. v. S.W. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

However, even if AAFCOR had not abandoned that essential element of its claim, this court finds, as further discussed below, that it could not meet its burden to satisfy the reasonable *or* justifiable reliance standard based on the facts and evidence presented.

       4.    Conspiracy

AAFCOR claims that all Defendants are liable under Alabama conspiracy law because of their allegedly concerted effort to defraud AAFCOR.  Under Alabama law, civil conspiracy is defined as the "combination of two or more persons to accomplish an unlawful end (by civil law standards) or to accomplish a lawful end by unlawful means."  *Eidson v. Olin Corp.*, 527 So. 2d 1283, 1285 (Ala. 1988) (citation omitted).  By nature, its existence "must often be inferred from circumstantial evidence and the relationship of the parties, as opposed to direct evidence."  *Id.* Proof of conspiracy also requires proof of an "underlying tort."  *See Willis v. Parker*, 814 So. 2d 857, 867 (Ala. 2001).

**B.**    **Analysis**

The bankruptcy court found that because AAFCOR's fraud, fraudulent suppression, and accounting malpractice claims shared the required element of reasonable or justifiable reliance, its decision that AAFCOR could not prove this element as a matter of law pretermitted discussion of the remaining elements.  Further, the bankruptcy court found that its granting of summary judgment in favor of Defendants on those claims preempted AAFCOR's conspiracy claims altogether.  *See Willis v. Parker*, 814 So. 2d 857, 867 (Ala. 2001) ("A conspiracy cannot

27

exist in the absence of an underlying tort.").  This court follows the same approach because, based on its independent evaluation of the record and case law, it finds that AAFCOR cannot prevail as a matter of law on the issue of reasonable reliance, the common element essential to its Alabama fraud and fraudulent suppression claims raised on appeal, and its conspiracy claim cannot survive absent an underlying tort.

Looking at the evidence submitted *de novo* and based upon its independent review of the record, the court finds that the bankruptcy court's decisions granting summary judgment in favor of the Defendants are due to be affirmed.  The court has reviewed not only the pleadings, appellate briefing, and evidentiary submissions of the parties, but also much of the deposition testimonies of Zerbo and Hirsch, which clarify what the briefs obfuscate.  After viewing the contested facts of this case in the light most favorable to AAFCOR, the court finds that no genuine issues of *material* fact exist that preclude summary judgment.  The court reaches its conclusion largely in light of admissions by Hirsch and Zerbo and other undisputed evidence relevant to the issue of reasonable reliance.

Because analysis of the reliance element requires discussion of facts and testimony common to all claims and parties, the court will address AAFCOR's claims against all Defendants together.

*Heightened Burden*

At the outset, the court stresses the impact of the heightened evidentiary burden that applies to AAFCOR in this case.  As the bankruptcy court properly noted, Alabama law dictates that a plaintiff alleging fraud bears a significantly increased burden of "presenting substantial evidence to establish an issue of fact" as to reasonable reliance when the plaintiff "brings in an

28

expert," as AAFCOR did when it consulted an outside law firm to run title searches on the Springfield property. *See Burroughs v. Jackson Nat. Life Ins. Co.*, 618 So. 2d 1329, 1332 (Ala. 1993) (applying principle where investor-plaintiff consulted with accountant during his investigation). The Alabama Supreme Court explained that "the particular facts regarding the plaintiff's knowledge, understanding, and ability to comprehend change significantly" when an expert enters the scene, because "[t]he knowledge and understanding of the plaintiff's expert are attributed to the plaintiff." *Id.* The Alabama Supreme Court also recognized this principle in the context of the attorney-client relationship, imputing the attorney's knowledge and understanding to the client where she was represented by counsel when signing a legal document. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kirton*, 719 So. 2d 201, 201 (Ala. 1998).

The Alabama Supreme Court has found that a party's own relative degree of experience and expertise in a particular area also raises the bar for demonstrating reasonable reliance. *See Ex parte Ford Motor Credit Co.*, 717 So. 2d 781, 789 (Ala. 1997) (holding that a plaintiff sophisticated "in buying, selling, and financing automobiles" could not reasonably rely on a misrepresentation as to financing rate); *Med Plus Properties v. Colcock Const. Grp., Inc.*, 628 So. 2d 370, 378 (Ala. 1993) (holding that "an intelligent, educated person with experience in contracting for the construction of clinic buildings for his partnership" could not reasonably rely on a misrepresentation as to the necessity of obtaining a building permit).

AAFCOR does not contest the sophistication of its principals. (*See* AAFCOR Reply Br., Doc. 21, at 9). Zerbo, one of the two principals of AAFCOR, is in fact a practicing, licensed attorney and CPA. Hirsch, the other principal, possesses the intellect and educational background of a rocket scientist, quite literally. The testimonies of Zerbo and Hirsch

29

demonstrate their professional knowledge, experience, and understanding about how to conduct the very transaction at issue.  Hirsch testified he has been in the business of consulting and turning around businesses for over four decades, and is experienced in conducting due diligence. Likewise, Zerbo indicated her experience in handling real estate investments on behalf of her clients, structuring loans actually secured by real property, and auditing business financials.

The court finds that AAFCOR, in light of the extensive resumes of its principals, cannot escape application of the significantly heightened evidentiary burden of proof to its fraud claims. The heightened burden especially impacts determination of the reasonable-reliance element, which considers the totality of the circumstances, including the relative sophistication of the parties.  *See Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997).  The court takes into account, where necessary, the varying degrees of sophistication of the Defendants—Pope, a loan broker; Spires, an accountant; and the Shelton brothers, who are businessmen/property owners. On balance, however, the relative sophistication of the Defendants does not affect the outcome of the court's analysis, which draws largely from the admissions of Zerbo and Hirsch.

*Reasonable Reliance?*

As discussed above, AAFCOR's claims against Timothy Shelton under the Bankruptcy Code, as well as its accounting malpractice claim against Spires, necessarily fail for abandonment and the court need not address them.  Therefore, the only remaining dispositive claims for the court to address are the Alabama fraud claims against all Defendants and the fraudulent suppression claims against Spires and Kenneth Shelton.  These counts both arise under Alabama law and share the common element of reasonable reliance.  As previously stated, the key question before the court is whether AAFCOR presented substantial evidence that it

30

*reasonably relied* upon the alleged fraudulent misrepresentations, or suppressions, of the

Defendants as to a) Timothy Shelton's purported ownership of the SPNW property, and b) other

incorrect figures listed in Timothy Shelton's 2006 financial statement.  The court is mindful, as

discussed above, that a significantly heightened evidentiary burden applies to AAFCOR's burden

of proof on reasonable reliance because of the sophistication and expertise of its principals.

Reviewing the record *de novo*, the court finds that Plaintiff's proof fails on the essential

element of reasonable reliance as a matter of law for two independent reasons.  First, AAFCOR

is presumed by law to have relied upon its own independent investigation of the underlying facts

rather than the alleged misrepresentations.  Therefore, the Plaintiff has not established the

required reliance upon the Defendants' misrepresentations, and the claims necessarily fail.

Second, in the alternative, the court finds that even if reliance were met, AAFCOR has in no way

met its heightened burden of demonstrating that its reliance was *reasonable* as a matter of law.

Absent reasonable reliance, AAFCOR cannot recover on its fraud and fraudulent suppression

claims.  Therefore, the court agrees with the bankruptcy court that summary judgment is merited

in favor of the Defendants.

    1.   No Reliance

Under Alabama law, where a party alleging fraud undertakes an independent

investigation of the facts, that party is presumed by law to have relied upon its investigation

rather than the alleged misrepresentations under certain circumstances.  *See Burroughs v.

Jackson Nat. Life Ins. Co.*, 618 So. 2d 1329, 1332 (Ala. 1993).  The Alabama Supreme Court has

stated the rule as follows:

      "[T]he representee will not be prevented from availing himself of false

representations unless he makes an investigation on his own account and it is of such character as to acquaint him fully with the essential facts.  If the representee makes an investigation, however, that is free and unhampered, and he learns the truth, *or conditions are such that he must obtain the information he desires*, or if the facts he seeks to know are as obvious to him as to the representor, and their means of knowledge are equal, he is presumed to rely on his own investigation, and not on the representation.  In such case he cannot be misled by the representor."

*Id.* (quoting 37 Am. Jur. 2d *Fraud and Deceit* § 230 (1968) (emphasis in original)).

Application of this presumption to this case is straightforward.  AAFCOR undertook *two* independent investigations as to the truth of the contents in the fraudulent documents upon which it purportedly relied, and specifically as to the true ownership of the SPNW property.  First, AAFCOR admits that Hirsch performed due diligence, including a "thorough investigation" of the SPNW business records and property, visiting the SPNW property "more than 120 times." (*See* AAFCOR Reply Br., Doc. 21, at 8-14).  With assistance from SPNW's office manager, Hirsch personally reviewed the records in the SPNW offices to verify the existence of all items and properties listed as assets on Timothy Shelton's financial statement.  He also conducted a thorough audit of all equipment listed.  Hirsch testified that in the process of his due diligence, he confirmed the existence and ownership of all the real properties listed on the financial statement. (Hirsch Depo., pp. 99-101, 104).

Most importantly, in the course of Hirsch's due diligence on the SPNW property, he went to a courthouse in Florence "looking for land ownership and title information," and with the assistance of the clerk of court, he *actually discovered* a copy of the warranty deed that transferred the SPNW property from Timothy to Kenneth Shelton on August 31, 2000, for a stated consideration of $10.00.  (*See* Hirsch Depo., p. 244).  While the documents Hirsch

obtained from his own title search "show[ed] the legal description of the land that was owned by

Tim Shelton and the land owned by Kenneth Shelton," he testified that he did not understand the

descriptions, which conveyed the land in metes-and-bounds terminology.  However, he did not

ask his attorney-partner Zerbo to translate the documents, despite knowledge of her legal

training.  (*Id.* at 244-45)  Hirsch's deposition testimony reveals his efforts to de-code the deed

after he discovered it at the courthouse:

> Q.  Did you ever pull any tax maps to get parcel numbers?
> A.  I believe that was part of the package that they helped me put together.
> Q.  Who was that?
> A.  The clerk that was there was helping me.
> Q.  Did you get the corresponding information for those parcel numbers?
> A.  **I didn't go into that detail.**  I just got all of the information that was pertinent to the land.  Then with – it had a section map for each parcel.  **I simply went back to Springfield and showed these to Tim Shelton and asked him to describe which land was Kenneth's and which land was his**.

(Hirsch Depo., pp. 245-46) (emphases added).

At the same time, Zerbo's testimony reveals that she relied on a *second* investigation by

the law firm Walston Wells & Birchall, LLP.  AAFCOR hired this law firm to conduct title

searches on the SPNW property "soon after" a conversation with Kenneth Shelton that revealed

he (Kenneth) actually owned the Springfield well and surrounding property instead of Timothy.

(Zerbo Depo., p. 157).  Consistent with this testimony, a chart chronicling AAFCOR's

expenditures for Timothy Shelton and SPNW reflects four payments to "Walston Wells"

throughout the fall of 2006 and early 2007 totaling $130,000.00.  (*See* Zerbo Depo., Ex. 2).

Zerbo's testimony admits her reliance on the "Walston Wells" investigation:

> Q.  Did you see any title searches ever – have you ever seen a title search done by anybody; you, your lawyers, anybody; that showed the Springfield properties owned by Tim Shelton?

> A.  I saw the title searches.  They're not identified as the Springfield properties in the title search, so I don't have personal knowledge or combination of title searches being labeled Springfield properties.  But they were done.  **And I relied on Walston, Wells to do what was necessary**.
>
> Q.  Did they tell you that the property was owned by Tim Shelton; Walston, Wells?
>
> A.  I don't recall having a specific conversation like that.

(*Id.* at 498-99) (emphasis added).

Applying the standard set forth in *Burroughs*, AAFCOR admittedly performed investigations on its "own account," and the court finds that the result of such investigations were "of such character as to acquaint [it] fully with the essential facts."  *Burroughs*, 618 So. 2d at 1332.  The material facts revealing the ownership of the SPNW property in which AAFCOR believed it held a security interest were a matter of public record.  AAFCOR actually searched for, discovered, and reviewed the properly recorded deed conveying the property to another owner.  Notably, AAFCOR does *not* argue that the deed it discovered contained any inaccuracies, ambiguities, or errors in the description of the land it conveyed; AAFCOR only argues that it "did not understand the legal description."  (Hirsch Depo., p. 244).  In fact, the deed conveyance contained a detailed metes-and-bounds description.  A survey of the land, therefore, would have readily revealed the true ownership of the property and dispelled any misrepresentations as to the security of AAFCOR's investment.

AAFCOR persists, however, in challenging the *readability* of the deed it discovered, arguing that "a cursory examination of the deed itself reflects that it is a metes and bounds description, with no indication as to whether the SPNW buildings are located thereon." (AAFCOR Reply Br., Doc. 21, at 7).  This argument, however, ignores the fundamental principles of property law underlying deed recordation and constructive notice.  "Under Ala.

34

Code 1975, § 35-4-90, the proper recordation of an instrument constitutes 'conclusive notice to all the world of everything that appears from the face' of the instrument." *Gilmore v. M & B Realty Co.*, 895 So. 2d 200, 211 (Ala. 2004) (quoting *Haines v. Tonning*, 579 So. 2d 1308, 1310 (Ala. 1991)).  Real estate purchasers, therefore, "are presumed to have examined the title records and knowledge of the contents of those records is imputed to them."  *Id.* (citations and quotations omitted).

Though AAFCOR is not a purchaser of real estate directly in the chain of title to the SPNW property, its purported security interest in the property, coupled with its actual discovery of the deed that earlier conveyed the property, bring it within the purview of constructive notice principles.  AAFCOR cites only one case, *Gilmore v. M & B Realty Co.*, 895 So. 2d 200 (Ala. 2004), to support its argument that the deed in this case did not provide notice "on its face" of the facts which AAFCOR sought to obtain.  AAFCOR argues that *Gilmore* represents "dispositive case law on constructive notice" standing for the principle that a deed containing a metes-and-bounds description "does not reflect on its face the actual identity of the property described therein."  (AAFCOR Reply Br., Doc. 21, at 5).  This characterization cannot stand, however, because *Gilmore* did not involve or even discuss a metes-and-bounds deed description.

The facts in *Gilmore* are readily distinguishable from this case because they involved a "comedy of errors" concerning typographical confusion over the address digits "4369" versus "4360," which led the plaintiffs into occupying a home different from the one they purchased. *Id.* at 203-04.  Moreover, the Court found it "significant" that the Gilmores were "first-time home buyers," and emphasized that "the reasonableness of their reliance must be measured taking that circumstance into consideration."  *Id.* at 210.  Thus, the facts and analysis in *Gilmore*

35

are inapposite to this case, where the Plaintiff has identified no typographical errors in the figures contained in the discovered deed and Plaintiff's members are highly sophisticated investors.  In no way can *Gilmore* be read to support AAFCOR's position that a metes-and-bounds deed description does not describe "on its face" the property it conveys.

Importantly, AAFCOR cites to *no* Alabama case, nor does the court believe it could, that specifically holds that a metes-and-bounds description does not provide notice "on its face" of the property conveyed.  To the contrary, Alabama courts have long revered metes-and-bounds descriptions of property as *superior* to other forms of property descriptors, holding that where two or more property descriptions conflict in a deed document, the metes-and-bounds description controls because of its precision.  *See Self v. Petty*, 469 So. 2d 568, 570-71 (Ala. 1985) ("The law in Alabama is clear that when there is a definite description of the property it is controlling over the 'more or less' language, which is merely cumulative to the precise 'metes and bounds' description."); *Guilmartin v. Wood*, 76 Ala. 204 (Ala. 1884) ("It is a principle long and well settled, that where a conveyance describes the premises by clear and definite metes and bounds, from which the boundaries can be readily ascertained, such description shall prevail, and determine the boundaries and location, over general words of description.").

Given the sophistication of AAFCOR's principals, the court cannot accept that their inability to "understand the legal descriptions" contained in the deed presents a reasonable excuse to instead rely upon Timothy Shelton's oral representations interpreting the deed under the circumstances.  First, Timothy, the debtor seeking AAFCOR's financial investment, is an obviously interested party to the transaction; he is neither a lawyer nor a land surveyor professionally competent to interpret a deed description.  Second, Hirsch is experienced in

36

performing due diligence in business transactions for more than 30 years.  He knew his partner

was a practicing attorney, yet did not consult with her about the meaning of the "legal

descriptions" that he did not understand.  Given Hirsch's admitted lack of understanding of the

deed evidencing a property transfer from Timothy to Kenneth, and his vast experience in

performing due diligence in like transactions, Hirsch's failure to present the deed to *any person*

for interpretation other than Timothy Shelton (an interested party), let alone his lawyer partner, is

unreasonable as a matter of law.

Further, an axiomatic principle of partnership law is that knowledge of one partner is

generally imputed to the other.  *See CIT Grp./Equip. Finan., Inc. v. Roberts*, 885 So. 2d 185

(Ala. Civ. App. 2003).  Hirsch's partner, Zerbo, testified as to her knowledge and experience

with title searches in similar situations:

> Q.  Are title searches typically done on a property that's being sold?
> A.  Yes.
> Q.  Have you seen a title search before?
> A.  Yes.
> Q.  When attracting these investors in these properties, is a title search important?
> A.  Yes.
> Q.  And in your professional opinion as a lawyer, is it required to do a title search before you would invest in purchasing property?
> A.  Yes.
> . . . .
> Q.  Would you ever counsel your clients not to have a title search done on a piece of property before they buy it or invest in the purchase of it?
> A.  A title search should be done.
> Q.  Have you ever invested in property or helped clients invest in property where a title search wasn't done?
> A.  Not to my knowledge.

(Zerbo Depo., pp. 20-21).

Zerbo later stated that it would be malpractice for a lawyer such as herself to fail to advise

a client of the need to perform a title search prior to lending money based upon representations as to ownership of real property.  (*Id.* at 48-49).  Despite her testimony, Zerbo's complete lack of follow through to discern the results of the title searches performed by Walston Wells and by her partner, Hirsch, is unreasonable when compared to the standards of her profession, if not reckless, or at best, negligent.  The court finds no reason to absolve Zerbo and her colleague from the legal consequences of their failure to follow her own standard legal advice.

Moreover, the *Gilmore* case on which AAFCOR relies presents several key distinctions that actually work against its argument.  As previously noted, the plaintiffs alleging fraud in *Gilmore* "were first-time home buyers," and the Court found that "the reasonableness of their reliance must be measured taking that circumstance into consideration."  *Id.* at 210.  The Court held that the plaintiffs could not be "charged with what a title examination would have revealed" where the facts material to the fraud issue in that case could only be discerned by consulting a separate plat book to see if the house and lot they were sold was in fact the house and lot conveyed.  *Id.* at 212.

By contrast, taking the sophistication of Zerbo and Hirsch into consideration, this court has no doubt that the duo should be charged under the law with the ability to read a metes-and-bounds deed description, *or at the very least* the knowledge of how to take the steps necessary to understand such a description.  In fact, the Court in *Gilmore* essentially confirmed as much:

> Under the reasonable-reliance standard, "the trial court can enter a judgment as a matter of law in a fraud case [based on the expiration of the statutory limitations period] where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were **fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore** written contract terms [that clearly contradicted the alleged misrepresentations]."

*Id.* at 209-10 (quoting *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997)).

The court thus concludes that AAFCOR is presumed as a matter of law to have relied upon its independent investigations into the ownership of the SPNW property, because they obtained at least constructive knowledge of the facts they sought in the title search, notwithstanding their lack of diligence and inexcusable neglect in failing to decipher the results of their investigation, *i.e.*, the actual acreage of the deed's metes-and-bounds description. *See Burroughs*, 618 So. 2d at 1332. Stated another way, AAFCOR as a matter of law cannot have reasonably relied on the Defendants' alleged misrepresentations concerning land ownership in light of its independent investigations that contradicted those misrepresentations.

### 2.    Alternatively, Reliance Not Reasonable

Even if AAFCOR were found to have relied upon the Defendants' alleged misrepresentations and not its own investigations, AAFCOR has not met its significantly heightened burden of demonstrating that its reliance was *reasonable* as a matter of law. The court first notes that AAFCOR fails in its briefs to articulate any affirmative arguments or specific reasons as to *why* AAFCOR's reliance should be deemed reasonable in this case. Instead, AAFCOR exclusively focuses on refuting various arguments of the Defendants and attempting to distinguish the cases cited by the bankruptcy court. The court has reviewed those cases and finds that AAFCOR's attempts to distinguish them fall short because the nature of fraud cases, and of the reasonable-reliance determination in particular, is heavily dependent upon the particular facts and circumstances of each case.[10] In a fraud case, a plaintiff cannot establish

---

[10]   Those cases include *Burroughs v. Jackson Nat. Life Ins. Co.*, 618 So. 2d 1329 (Ala. 1993); *Smith v. JH Berry Realty Co.*, 528 So. 2d 314 (Ala. 1988); *Southern Life & Health Ins. Co. v. Smith*, 518 So. 2d 77 (Ala. 1987); *Bedwell Lumber Co. v. T&T Corp.*, 386 So. 2d 413

the reasonable-reliance element by arguing that "reliance is reasonable because no case is directly on point that says that it is unreasonable"; such argument presents a *non sequitur*. Thus, AAFCOR's argument that "there is not a single case which holds that AAFCOR should have come to have this further information," (AAFCOR Br., Doc. 9, at 56), is fallacious, and even if true in the technical sense, it does not foreclose the court's analysis of reasonable reliance, or lack thereof, under the facts of this case.

Alabama fraud law dictates that this court look to the particular sophistication, education, and professional experience of the principals of *this* particular Plaintiff in light of the relevant facts and circumstances; applying general principles of law gleaned from other cases, this court must decide whether reliance was reasonable as a matter of law in *this* particular case, not in some other case with different facts. In all its effort to distinguish facts that were material to *other* fraud cases, AAFCOR neglected to argue that any of the material facts in *this* case demonstrate the reasonableness of its reliance on the alleged misrepresentations. After reviewing the record in full, the court cannot find any facts or evidence, viewed in the light most favorable to AAFCOR, that constitute a genuine issue of fact material to its reasonable reliance. In fact,

---

(Ala. 1980); and *Patterson v. Unites Companies Lending Corp.*, 4 F. Supp. 2d 1349 (M.D. Ala. 1998). The court finds that the bankruptcy court primarily used these cases to establish the general statements of law and overarching principles that apply to this case, without engaging in a fact-intensive comparison of each case. Nevertheless, AAFCOR attempts to distinguish the particular facts of each case to show that the bankruptcy court's use of those cases was misplaced. For example, AAFCOR argues that the *Bedwell Lumber* case "is virtually on 'all fours' with the case at bar and warrants a reversal of summary judgment." (AAFCOR Br., Doc. 9, at 43). However, this court has reviewed *Bedwell Lumber* and disagrees with AAFCOR's characterization of that case. Because of the fact-specific nature of fraud analysis, which takes into account the surrounding circumstances *and* sophistication of the particular parties, the court finds that AAFCOR's attempts to distinguish all these cases falls short. None of those cases support the reasonableness of AAFCOR's reliance given the facts of *this* case; the court thus does not set out the particulars of those cases.

most of the evidence presented by AAFCOR, including the deposition testimony of its principals, bodes *against* a finding of reasonable reliance.

AAFCOR is, by admission, a fast-moving hedge-fund investment operation, "not in the business of making traditional loans." (AAFCOR's Objs. to Prop. Findings of Fact & Conc. of Law, Doc. 2, at 12). By nature, its work is risky, not reasonable. In fact, the risk involved is the very impetus that propels hedge-fund investment: if successful, the rewards are high, but if not, the risk of loss is great. In its briefs, and in the depositions of its principals, AAFCOR admits both the risk of its activity and the sophistication of its principals. Under Alabama law, both factors bode against reasonable reliance considering the circumstances and facts of the transaction at issue.

Notwithstanding AAFCOR's failure to put forth any affirmative reasons why its reliance *was* reasonable under the circumstances, the court finds that the evidence presented shows that its reliance *was not* reasonable as a matter of law. First, the undisputed material facts reveal that the true ownership of the SPNW property was a matter of public record, which AAFCOR actually discovered and reviewed. Second, AAFCOR had ample reason to "doubt the truth" of the information contained in Timothy Shelton's March 31, 2006 financial statement, which demonstrates that its purported reliance on that document was reckless, or at least negligent. Finally, several facts and circumstances, or a combination thereof, should have excited AAFCOR's suspicion about the alleged misrepresentations. Absent reasonable reliance, AAFCOR cannot recover on its fraud and fraudulent suppression claims.

a)    *Actual Discovery of the Recorded Deed*

Reliance cannot be reasonable as a matter of law where the party alleging fraud has

"knowledge of the falsity of a representation." *Patterson v. United Cos. Lending Corp.*, 4 F. Supp. 2d 1349, 1354 (M.D. Ala. 1998) (applying Alabama law) (citation omitted).  Moreover, if the party alleging fraud "blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, '*volunti non fit injuria.*'" *Alfa Life Ins. Corp. v. Green*, 881 So. 2d 987, 992 (Ala. 2003) (quoting *Munroe v. Pritchett*, 16 Ala. 785, 1849 WL 538, *2 (Ala. 1849) (quotation marks omitted).   Thus, the reasonableness of AAFCOR's trust in the various representations of the Defendants as to the ownership of the SPNW property must be measured against its diligence in "seeing" the results of its own title searches, versus blindly closing its eyes to what ordinary diligence would have required it to see.

The court finds that AAFCOR's independent title searches are the single most important factor impacting the reasonableness of AAFCOR's purported reliance upon misrepresentations about Timothy Shelton's ownership of the property at issue, *i.e.*, the Springfield property where the SPNW bottling plant and office buildings were located.  Though AAFCOR denies *actual* knowledge of the results of its title searches, it had undisputed actual *notice* of the property conveyed by the deed, if not constructive knowledge of the deed's contents.  *See Haines v. Tonning*, 579 So. 2d 1308, 1310 (Ala. 1991).  In the context of this case, detailed as follows, such knowledge precludes reasonable reliance.  *See Patterson*, 4 F. Supp. 2d at 1354.

The key to understanding the importance of the title search vis-à-vis reasonable reliance is AAFCOR's belief that the security for its loans "was in the Springfield properties."  (Zerbo Depo., pp. 47).  Zerbo testified that she believed AAFCOR held a "first priority lien" on the Springfield property.  (*Id*. at 49).  In light of AAFCOR's belief that the Springfield property

42

served as "collateral" (*id.* at 49, 246, 251, 499-500) for its loans to Timothy Shelton and SPNW,

which totaled more than $1.5 million, ascertaining the true ownership of the property was

essential.  According to Zerbo:

> Q.    Would it be important to you to know what secures your $1.7 million
>         worth of loans or $1.4 million worth of loans?
> A.    **Absolutely**.
> Q.    Did you take – did you investigate as to what was securing it?
> A.    **We were ongoing in that investigation.  Yes.**

(*Id.* at 499) (emphases added).

At the same time, Zerbo admits that AAFCOR did not conduct a title search or check to

see if a mortgage was on the property *before* it lent the initial $300,000.00 to Tim Shelton and his

water businesses; neither did AAFCOR execute or record a mortgage or any type of lien to secure

its loans *after* it lent the money, despite Zerbo's knowledge of how to perfect a security interest

in real property.  (*Id.* at 51, 61-62).

At some point after its initial $300,000.00 investment, AAFCOR ran several independent

investigations into the ownership of the property upon which it believed it had a security interest,

as outlined above.   AAFCOR argues that ". . . while Hirsch did perform due diligence, his due

diligence *did not reveal the true ownership* of the SPNW buildings and the land."  (AAFCOR

Reply Br., Doc. 21, at 15) (emphasis added).  However, this statement is nothing more than a

sleight of hand.  The facts, as Plaintiff tells them, speak for themselves.

On one hand, Hirsch had *actual possession* of the deed that undisputedly revealed the

conveyance of all the Springfield property from Timothy to Kenneth Shelton in August 2000.

(Hirsch Depo., p. 244).  A simple survey of the land would have readily revealed the scope of the

transaction, down to the precise circumference of the acreage conveyed.  Rather than consult an

expert to decipher the legal descriptions that he "did not understand," however, Hirsh asked only Timothy to interpret the document.  (*Id*. at 246).

On the other hand, Zerbo, an attorney experienced in advising clients in real estate investments, testified that she "had no reason not to rely on" Timothy's continuous representations that he owned the land, yet she testified it would be *malpractice* for her to fail to advise a client to perform a title search prior to lending money using real property as collateral. (Zerbo Depo., pp. 48-49, 251).  Despite Zerbo's admission of her knowledge of the importance of performing a title search *prior to* lending money that purports to be secured by real property, AAFCOR did not perform a title search on the subject property until *after* it lent at least $300,000 to Timothy Shelton and SPNW.  (*Id*. at 319-20).  And when she *did* receive from the attorneys the results of the title searches on the property, she failed to act on them, or even remember what they disclosed.

The court cannot thus say that AAFCOR's search came up empty-handed.  In fact, the court finds that Zerbo's failure to act on the results of the title search, in light of her testimony about malpractice, is negligent, if not reckless.  By its ordinary definition, recklessness signifies one who is "[h]eedless of *or indifferent to* the consequences of one's actions; lacking in prudence or caution; willing or liable to take risks; rash, foolhardy; irresponsible."  Oxford English Online Dictionary (2011), *available at* www.oed.com:80/Entry/159581.  It also can mean "inattentive, lacking in diligence." *Id.*

As explained by the Alabama Supreme Court, "Because it is the policy of courts not only to discourage fraud *but also to discourage negligence and inattention to one's own interests*, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some

44

measure of precaution to safeguard their interests." *Alfa Life Ins. Corp. v. Green*, 881 So. 2d

987, 992 (Ala. 2003) (emphasis added) (quotation marks and citation omitted).  AAFCOR here

completely failed to exercise the measure of precaution to safeguard its interests that one of its

principals deems necessary in every transaction of this kind.  Not only did AAFCOR fail to act

on the results of its two separate title searches, it failed to take the requisite steps to perfect its

purported lien on the Springfield property.  Despite her knowledge of how to execute and file a

mortgage to secure a property interest, Zerbo failed to follow through.

Hand in hand with her inattention to preservation of AAFCOR's interests in securing the

property that was the subject of its loans, Zerbo's testimony further reveals the recklessness of

her reliance:

> Q.  Did you think you had any responsibility to determine who owned that
> [SPNW] property before you loaned money?
> A.  **Given Tim's representations continuously, given no rebuttal of that by
> Mr. Pope, either verbally or in his business plan, given a personal financial
> statement from an accountant that Tim has used for a very long time; I had
> no reason not to believe him**.

(Zerbo Depo., p. 251) (emphasis added).  Zerbo and Hirsch claim to have relied on these oral and

written representations to the exclusion of its own title searches.

Simply put, AAFCOR's principals blindly trusted where they should not, triggering

application of *volenti non fit injuria.  See Munroe v. Pritchett*, 16 Ala. 785, 1849 WL 538, *2

(Ala. 1849).  AAFCOR essentially hedged its bets on the overestimated financial worth of a

heavily indebted individual and his ownership of significant property based *solely* on oral

representations, an uncertified financial statement signed only by the debtor, and an unaudited,

partial business plan.  Moreover, it did so without taking the steps necessary to perfect its

purported "first priority lien," when it held in its hands the very paper that revealed the recklessness of its course of action.  Where such highly sophisticated investors with ample experience in real estate investment take such a gamble, the only word the law can ascribe to such conduct is reckless, not reasonable.  This conduct exemplifies the legal doctrine of *volenti non fit injuria*—voluntary exposure to risk despite knowledge and comprehension of the danger involved.  In light of such negligent, if not reckless, inattentiveness to its own interests, AAFCOR cannot be said as a matter of law to have *reasonably* relied on the unaudited financial statement, the partial business plan, or on any alleged oral misrepresentations of the Defendants as to the ownership of the SPNW property.

b)  *Reckless Reliance on Uncertified Financial Statement*

In addition to the alleged misrepresentations as to the ownership of the SPNW property, AAFCOR claims that it relied on "other figures" in Timothy Shelton's financial statement, which turned out to be false, in making its investments.  The court also finds that AAFCOR has not met its heightened burden of showing that its reliance on these "other" false figures is reasonable as a matter of law.  The Alabama Supreme Court has stated:

> Our decisions clearly establish that a reliance upon a representation must be reasonable, and that **when one has reason to doubt the truth of the representation made to him, or is informed of the truth before he acts, that party has no right to act upon the representation**. *Midstate Homes, Inc. v. Holt*, 52 Ala. App. 415, 293 So. 2d 476 (1974). Moreover, **knowledge of facts which ought to excite inquiry and which, if pursued, would lead to knowledge of other facts, operates as notice of the other facts**. *Williams v. Dan River Mills, Inc.*, 286 Ala. 703, 246 So. 2d 431 (1971). *See also Bedwell Lumber Co. v. T & T Corp.*, 386 So .2d 413 (Ala. 1980), and *Mahoney v. Forsman*, 437 So. 2d 1030 (Ala. 1983).

*Halbrooks v. Jackson*, 495, So. 2d 591, 592 (Ala. 1986) (emphases added).

Here, the court finds that AAFCOR had ample reason to "doubt the truth" of the information contained in Timothy Shelton's March 31, 2006 financial statement, which is the basis of AAFCOR's fraud claims against Timothy Shelton and its fraud and fraudulent suppression claims against Frank Spires, his long-time accountant.

First and foremost, AAFCOR unquestionably knew that the "financial statement" signed by Timothy Shelton was neither audited nor certified.  (Hirsch Depo., p. 95; Zerbo Depo., pp. 119-20).  In fact, Frank Spires' name does not appear anywhere on the face of the document; neither does the name of his accounting firm.  While Spires did admit that he "put together" the statement at Timothy Shelton's request, he also stated to Hirsch that he "*didn't certify it*." (Hirsch Depo., pp. 94-95) (emphasis added).  Hirsch admits that Spires made no affirmative statement as to the truth of its contents.[11]  Hirsch testified that AAFCOR nevertheless relied on the accuracy of the document based solely on Spires's "reputation."  (Hirsch Depo., p. 113).

To less sophisticated investors, perhaps Spires's oral representation that he "put together" the financial statement would be enough to constitute reasonable reliance as to the accuracy of its contents.  However, in light of the sophistication of AAFCOR's principals and Spires's express disclaimer that the document was "not certified," its reliance on an unaudited financial statement cannot be viewed as reasonable as a matter of law.  Spires's disclaimer should have immediately signaled questions in Zerbo and Hirsch's minds as to the accuracy of the document's contents.

---

[11] Although AAFCOR admits that Spires made no such affirmative statements, it relies on *Jackson Co. v. Faulkner*, 315 So. 2d 591 (Ala. Civ. App. 1975), to support its argument that Spires should be liable for telling a "half truth."  (*See* Appellant Br., Doc. 9, at 24-25).  That case stands for the principle that when one endeavors to speak on a matter, "he must make a full and fair disclosure."  315 So. 2d at 600.  However, the court notes that this principle developed in context of the *duty* element of fraudulent misrepresentation, which is not relevant to this court's discussion of the *reasonable reliance* element.

47

Zerbo, as a CPA herself, is charged with knowledge of the accounting standards of her profession, which certainly encompasses knowledge as to the credibility of an audited versus nonaudited financial statement.

Hirsch is no less knowledgeable about this basic accounting standard, as he stated he has worked with "[m]aybe a dozen" independent CPAs in his years of performing due diligence in investment deals.  (Hirsch Depo., p. 113).  Based on this experience, Hirsch testified that he understood the significance of an *unaudited* financial statement:

> Q.  Why would you want it to be audited as opposed to a nonaudited financial statement?
> A.  Well, audited you have full confirmation of the professional accounting firm.  Nonaudited means that they don't certify that everything is exactly as stated, as I understand.
> Q.  Is that the only reason?
> A.  Outside lenders generally prefer to have audited financial information, yes.

(Hirsch Depo., p. 109).

Applying AAFCOR's heightened burden of establishing its reasonable reliance on the figures contained in the financial statement, the court cannot say that AAFCOR has met its burden where 1) neither Spires's name nor the name of his accounting firm appear anywhere on the face of the financial statement; 2) Hirsch and Zerbo admitted knowledge that the financial statement was neither certified nor audited; and 3) Spires in fact stated to Hirsch that Spires "did not certify" the statement.  Additionally, both Zerbo, an attorney and CPA, and Hirsch, who had worked with at least a dozen independent CPAs while performing due diligence over the course of his business investment career, had actual knowledge about the diminished reliability of an uncertified financial statement.  These facts and circumstances gave AAFCOR ample reason to

"doubt the truth" of the misrepresentations contained in Timothy Shelton's financial statement, and ought to have excited further inquiry under Alabama law.  Therefore, AAFCOR has not shown, nor can it show, that its reliance on *any* of the contents in Timothy Shelton's financial statement was reasonable as a matter of law.

           c)    *Suspicious Circumstances*

      Finally, AAFCOR cannot establish reasonable reliance as a matter of law if a reasonably prudent person exercising ordinary care would have discovered the facts, or if the circumstances should have aroused suspicion in the mind of a reasonable person.  *See Southern Life & Health Ins. Co. v. Smith*, 518 So. 2d 77 (Ala. 1987).  In addition to the circumstances discussed thus far, at least four facts or circumstances should have aroused AAFCOR's suspicion and/or caused it to doubt the truth of the alleged misrepresentations.

      First, the court agrees with the bankruptcy court's finding that "the admitted knowledge that Kenneth Shelton owned the well property would have led AAFCOR to question whether it could take Kenneth's word alone that he would continue to supply water to his brother's business without a written contract *and to question the value of the plant property* without a water source."  (Shelton Mem. Op., at 20-21) (emphasis added).  Timothy Shelton's March 31, 2005 financial statement, upon which AAFCOR purportedly relied, lists the "Springfield Premium Natural Water, Inc. (65 acres)" as a $5 million real estate asset.  Contrary to the plain language of the asset described, AAFCOR takes the position that the $5 million figure representing "Springfield Premium Natural Water, Inc. (65 acres)" did *not* include the springs and the well, which it already knew to be owned by Kenneth and adjacent to the plant facility and office buildings.  Notably, AAFCOR does not argue or provide any evidence that the actual total area of

the Springfield property, *including the springs and well*, is *greater* than 65 acres, which might make such an inference reasonable.

The bankruptcy court did not find AAFCOR's inference to be reasonable, indicating in its opinion that the $5 million projected value for the SPNW buildings *without the adjacent water source* was in no way plausible.  (Shelton Mem. Op., at 20 n.5) (". . . the Court firmly believes that the property at issue was virtually worthless without the rights to adjacent water well and it is uncontested that AAFCOR knew same was owned by Kenneth Shelton.").  After its own review of the evidence presented, this court agrees.

Though AAFCOR strenuously objects to the bankruptcy court's evaluations of the projected value of the SPNW property absent rights to the well, Hirsch's testimony confirms, at least in part, that AAFCOR did, in fact, view the well as a part of the overall value of the SPNW properties:

> Q.  The road leading to the bottling plant, did it have any value without the water source being there?
> A.  **No.  The whole facility needed water**.
> Q.  The land that you say Tim represented was his and the buildings and everything, was their value enhanced because the water source was there or did the water source have any effect at all on the building values?
> A.  **We felt it was a combination of both**.
> Q.  Well, if there was no well source there, no water source there, would you have been interested in Tim Shelton's property?
> A.  **Initially, no.**

(Hirsch Depo., pp. 155-56) (emphases added).

Hirsch's testimony also confirms that AAFCOR elected to invest in Timothy Shelton's water enterprises, despite full awareness of the risk involved:

> A.  We had Tim's brother's water.  We had Kenneth's water source.  Kenneth continually made representation that as long as his brother was involved, he wasn't

- as long as we continued to I assume pay the obligation for the land, that he had
no reason to cut off the water supply.
Q.  Is there any reason why he couldn't have cut off the water supply?
A.  He could have.
Q.  A little risky loaning up to $2 million, isn't it, based upon representation like
that?
A.  Yes.
Q.  Did you know that risk when you went into it?
A.  I have to say we did, yes.
Q.  And you loaned the money in light of that risk?
A.  Yes.

(Hirsch Depo., pp. 156-57).  AAFCOR's admitted knowledge of the risk of an unsecured water

source and its valuation of the property as dependent, in part, on an on-site water source, should

have aroused suspicion in the mind of a reasonable person about the projected value of the

property—apart from the water source—in the March 31, 2005 financial statement.  Thus,

AAFCOR's reliance through its sophisticated principals on that figure cannot be viewed as

reasonable as a matter of law.

Second, Hirsch's testimony shows that when AAFCOR was first informed of the

potential investment deal, Jim Pope represented that Timothy Shelton "had" *both* the "viable

water source supply" and bottling operation in Alabama—if not implying his ownership of both,

certainly implying his control.  (*See* Hirsch Depo., p. 70).  Based on this representation,

AAFCOR became interested in the deal and began lending money to Timothy Shelton.  Later,

when AAFCOR discovered that Tim Shelton actually *did not* own the water source, AAFCOR

had another reason to suspect the truth of the initial information it had received about Timothy

Shelton's ownership or control over the whole.  Thus, it cannot establish reasonable reliance as a

matter of law.

Third, Zerbo's testimony about her uncertainty of how much land was owned by Timothy

51

Sheldon versus Kenneth Shelton following a meeting with Kenneth indicates that AAFCOR

undertook its title searches in response to circumstances that triggered its suspicion as to who

owned what property:

> Q.  Were you confused after this meeting with Kenneth Shelton as to who
> or what - -
> A.  No, I was not confused.  Because it was consistent with what had been
> told to me; that is, Tim owned the Springfield properties.  And Kenneth owned
> the well and the water rights.  So I was not confused.  That's why I asked Kenneth
> for a license to pump the water.
> Q.  Well, I'm just - - I'm just curious because you keep saying the
> Springfield properties.  But we're referring to a well and a lake - - a little pond
> across the street?
> A.  Yes.
> Q.  And you're not sure how much land [was] associated with each.  Is that
> fair to say?
> A.  Well, the land around the well is no more than, I don't know, several
> feet.  You can - in diameter, however big the pump shed is, that's the land that it
> would sit on.  And I never went inside, but I'm sure the well head is in there.  But I
> was also told there was a - - somehow the well was associated with this pond.
> Now, together it's probably, I don't know, an acre or less.  And it was my
> understanding that Tim owned the balance.  And that understanding comes from
> the financial statement that said Springfield properties was 65 acres.  This was not
> 65 acres for the well.
> **Q.  Did you run any title searches at this point right after your**
> **conversation with Ken Shelton?**
> **A.  Soon thereafter.**

(Zerbo Depo., p. 156) (emphasis added).

As previously discussed, the fact that AAFCOR undertook its own independent

investigations as to the truth of the facts underlying the Defendants' representations about the

property ownership precludes it from claiming reliance on the Defendants' representations as a

matter of law.  *See Smith v. J.H. Berry Realty Co.*, 528 So. 2d 314, 316 (Ala. 1988).  Further, the

timing of AAFCOR's investigations into the ownership of the property, which Zerbo testified she

initiated soon after learning that Kenneth Shelton owned the water source on the Springfield

property, indicates that AAFCOR undertook that investigation to confirm its suspicions about the initial information it received as to property ownership. Thus, these circumstances establish AAFCOR's suspicion, or at least the circumstances that should have aroused its suspicion, causing it to doubt the truth of the alleged misrepresentations. As such, AAFCOR's reliance cannot be reasonable as a matter of law.

Fourth and finally, AAFCOR attempts to argue that the information sought was "not apparent" from the face of the deed document. In other words, it argues that it could not tell from the face of the deed that the land conveyed from Timothy to Kenneth Shelton on August 31, 2000 included *all* of the SPNW property. At the time it discovered the deed, AAFCOR had actual knowledge that Kenneth Shelton owned the well and surrounding property. Hirsch testified he could not understand the legal descriptions of the land conveyed in the deed, which were metes-and-bounds descriptions. Reviewing the deed, however, the court observes that the instrument conveys three distinct tracts of land—Tract I, Tract II, and Tract III. Neither Hirsch nor Zerbo, in their testimonies, nor AAFCOR in its briefs, describe the Springfield well and surrounding property as encompassing three separate tracts of land. In fact, Zerbo testified that it likely encompassed only "an acre or less." (Zerbo Depo., p. 156).[12] Therefore, the mere fact that the deed on its face conveyed *three* tracts of property should have put AAFCOR on notice that the land conveyed in the deed was more than the "one acre" tract, as Zerbo understood it,

---

[12] The court also observes that the length of feet in the metes-and-bounds descriptions defining the perimeter of the tracts conveyed represents more than one acre in a facially obvious manner. Thus, even without the expertise required to read a metes and bounds description, these figures should have been enough to put AAFCOR on notice that this deed, detailing three separate tracts of property, is not an instrument that merely conveyed a one-acre plot of land with a well.

containing the well and surrounding property.

This constellation of facts and circumstances should have raised suspicion in the mind of a reasonable person that the Defendants' alleged representations were untruthful.  A reasonably prudent person would have dug deeper to uncover the facts underlying the documents and statements upon which AAFCOR purportedly relied—and it would not have taken much digging to unearth the truth.  For these additional reasons, AAFCOR cannot establish reasonable reliance as a matter of law.

## VI.  Conclusion

The various alternative analyses above demonstrate that AAFCOR has not met its significantly heightened burden of demonstrating that it reasonably relied as a matter of law on the information contained in the unaudited financial statement, the partial business plan, or the alleged oral misrepresentations, or suppressions, of the Defendants.  First, AAFCOR's reliance upon its own independent investigations, rather than the alleged misrepresentations of the Defendants, is presumed by law.  AAFCOR cannot, therefore, demonstrate that it satisfied the reliance element common to its fraud and fraudulent suppression claims under Alabama law. Second, even if AAFCOR did rely on the alleged misrepresentations, it has not presented any argument, nor has it met its burden of substantial evidence, to demonstrate that its reliance was *reasonable* as a matter of law.  The court finds that AAFCOR's principals are highly sophisticated and experienced lenders who believed their investment loans held a first priority lien on a certain piece of property, yet during their due diligence, they *actually discovered and reviewed the deed instrument conveying that property to another owner*.  In fraud cases, Alabama law strongly discourages blind trust "where ordinary diligence requires him to see."

*Munroe v. Pritchett*, 16 Ala. 785, 1849 WL 538, *2 (Ala. 1849).  AAFCOR's blind trust in this case, in light of the facts and circumstances, precludes reasonable reliance as a matter of law.

Because AAFCOR's proof fails on reasonable reliance, an essential element of its fraud claims against all Defendants and its fraudulent suppression claims against Spires and Kenneth Shelton, these claims cannot survive Defendants' motions for summary judgment.

The court earlier found that AAFCOR abandoned its claims against Timothy Shelton under § 523(a)(2)(B) of the Bankruptcy Code for false financial statements and under § 523(a)(2)(A) of the Code for money obtained by fraud, as well as its claim against Spires for accounting malpractice under Alabama law; thus it need not reach those claims.  However, even if AAFCOR had not abandoned these claims, the court finds for all the reasons set forth above that the evidence presented is not sufficient to satisfy even any lesser standard of justifiable reliance associated with these claims.  Specifically, the court finds that AAFCOR's failure to rely on the results of its own title searches in favor of the oral representations of the debtor seeking its financing was "so utterly unreasonable, in the light of the information apparent to [AAFCOR], that the law may properly say that his loss is his own responsibility."  *City Bank & Trust Co. v. Vann* (*In re Vann*), 67 F.3d 277, 283 (Bankr. App. 11th Cir. 1995) (using justifiable reliance standard) (quotation marks and citation omitted).

Accordingly, the court finds that summary judgment is merited in favor of the Defendants on the Plaintiff's fraud and conspiracy claims.  AAFCOR's own admissions and other undisputed evidence support the court's finding that no genuine issues of material fact exist that would preclude summary judgment.  Moreover, Plaintiff cannot, as a matter of law, demonstrate that it reasonably or justifiably relied upon the alleged fraudulent representations of the Defendants.

55

Plaintiff's fraud, fraudulent representation, and accounting malpractice claims thus fail, as do Plaintiff's claims for conspiracy, which cannot survive apart from the underlying tort. *See Willis v. Parker*, 814 So. 2d 857, 867 (Ala. 2001) ("A conspiracy cannot exist in the absence of an underlying tort."). Because no genuine issues of material fact exist, and Plaintiff cannot prove an essential element of its claims, the Defendants are entitled to judgment as a matter of law.

In reaching this conclusion, the court does not condone the alleged misbehavior of the Defendants. As Ralph Waldo Emerson once said, "Every violation of truth is not only a sort of suicide in the liar, but is a stab at the health of human society." However, Alabama's strong policy against lying is tempered by the law's "concomitant duty" to safeguard ones own interests. *Alfa Life Ins. Corp.*, 881 So. 2d at 992 (quotation marks and citation omitted). Damages for fraud, under Alabama law, cannot be awarded unless the plaintiff establishes *all* elements of its claim. This court's role is not to sympathize with the Plaintiff's position but to ensure that it has established the requisite evidence as to all elements of its claims to overcome the Defendant's motions for summary judgment, which in this case, it has not.

Accordingly, the bankruptcy court's orders granting summary judgment on behalf of the Defendants and dismissing all Plaintiff's claims are due to be **AFFIRMED**. A separate order has been entered, and an amended final order will be entered simultaneously with this memorandum opinion.

DONE and ORDERED this 21st day of April, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE